IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Lamar Davis, ) | |
| ) | Civil Action No. 6:06-0838-WMC |
| Plaintiff, ) | |
| ) | **O R D E R** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a final order pursuant to Local Rule 73 and Title 28, United States Code, Section 636(c). The case was referred to this court for disposition by order of the Honorable Terry L. Wooten, United States District Judge, filed August 18, 2006.

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on May 5, 2003, and April 23, 2003, respectively, alleging that he became unable to work on January 1, 2000.[1] The applications

---

[1] The alleged disability onset date was later amended to February 27, 2003.

were denied initially and on reconsideration by the Social Security Administration. On December 8, 2003, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, his mother, and a vocational expert appeared, considered the case *de novo*, and on June 24, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 18, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)      The claimant's organic brain syndrome (mild), status post closed head injury, borderline intellectual functioning, and history of alcohol abuse are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c) and 416.920(c).
>
> (4)     These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)     The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)     The claimant retains the residual functional capacity for unlimited exertional work with no climbing ladders/ropes/ scaffolds and the need to avoid workplace hazards, such as dangerous machinery and unprotected heights, in work involving simple 1-2 step tasks involving low stress, non-production work with no contact with the public and occasional contact with coworkers.

>   (7)     The claimant's past relevant work as a cleaner did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565 and 416.965).
>
>   (8)     The claimant's medically determinable organic brain syndrome (mild), status post closed head injury, borderline intellectual functioning, and history of alcohol abuse do not prevent the claimant from performing his past relevant work.
>
>   (9)     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

>   the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which

3

prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff alleges disability beginning February 27, 2003, due to residuals of a 1995 closed head injury, memory problems, and "hearing [and] seeing things" (Tr. 102, 104, 109). The plaintiff was 22 years old at the time of his alleged disability onset and 24 years old at the time of the ALJ's decision[2] (Tr. 104). He completed the eighth grade and worked as a janitor/cleaner, truck unloader, packer, plumber's helper and temporary laborer (Tr. 110, 129-30, 135-37). The record indicates that he last performed substantial gainful activity as a plumber's helper in February 2001 and that the job ended because it was temporary (Tr. 129, 134).

The record reveals that the plaintiff sustained a closed head injury in an automobile accident in January 1995 when he was 15 years old (Tr. 170, 177). He was thrown from the car, lost consciousness for several days, and was hospitalized for three to four weeks. Afterward, he gradually regained functioning but demonstrated memory, attention, and impulse problems (Tr. 159-77). He became easily frustrated and angered

---

[2] The plaintiff was incorrectly identified as being 34 years old in the ALJ's decision (Tr. 18).

5

and began having problems in school in terms of leaving campus and being disrespectful (Tr. 170). The plaintiff indicated that prior to the accident, he had been a "B/C student" (Tr. 170). During the ninth grade, his mother removed him from school "before he could be expelled" (Tr. 170). The plaintiff also has a history of alcohol abuse and a single episode of moderate major depression as a teenager. His depression responded well to treatment and went into full remission by 1999 (Tr. 159-77). Toward the end of his treatment for depression, his social worker noted that he was "doing well," "continue[d] to seek permanent employment," and was "working to get [his] driver's license" (Tr. 160). He was involved in two additional car accidents, most recently in 2001, where he knocked out his front teeth and injured his right hand (Tr. 178, 191).

On January 29, 2003, the plaintiff underwent a neuropsychological evaluation by Mark T. Wagner, Ph.D. The plaintiff said that he had last worked in 2000, doing "basic cleaning part-time for ten months," and that he was fired for cursing at the staff and throwing food. He denied holding any other jobs. He said that depending on where he was living, his activities involved playing video games, watching television, being "always on the go," spending time with friends in the streets, and riding in cars "looking for girls." He said he stopped driving in 2001 because his insurance payments became too high. On examination, Dr. Wagner found the plaintiff had intellectual functioning "in the Borderline range," impoverished verbal memory, and impairment in sustained attention. The plaintiff reported psychotic symptoms including auditory and visual hallucinations, chronic agitation and aggression, magical ideation, and paranoia. His thought processes were "extremely concrete, with a hint of poor ties to reality," and he exhibited poor frustration tolerance. The Wechsler Adult Intelligence Scale 3 (WAIS-III) revealed that he had a verbal IQ of 73, a

performance IQ of 73, and a full scale IQ of 70.[3] Dr. Wagner diagnosed a chronic mild post-concussive syndrome and a psychotic disorder not otherwise specified (NOS). He found the plaintiff had "multiple cognitive deficits" that were likely caused by his post-concussive syndrome and that it was "extremely unlikely that his psychotic symptoms were secondary to a head injury." He indicated that medication "would likely be helpful" (Tr. 177-79).

On February 27, 2003, the alleged onset date of disability, the plaintiff presented to psychiatrist Dr. Paul Robbins of Oasis Christian Counseling for an initial assessment. He reported having auditory and visual hallucinations for the previous four months. On examination, Dr. Robbins found the plaintiff had concrete thought processes, suicidal and homicidal ideation, auditory and visual hallucinations, and delusions. He assessed alcohol abuse, rule out panic disorder, chronic mild post-concussive syndrome, and psychosis NOS. Dr. Robbins prescribed Seroquel (an antipsychotic drug) and advised the plaintiff to stop drinking (Tr. 228).

On March 22, 2003, Dr. Robbins noted that the plaintiff's mood and thoughts had improved with Seroquel, although he remained "mildly" psychotic (Tr. 227).

On April 8, 2003, the plaintiff presented to Dr. Thomas A. Privett, a neurologist, for an "evaluation of sequelae of closed head injury." The plaintiff told Dr. Privett that his primary difficulty was his inability to control his emotions, although he denied

---

[3] IQ scores between 71 and 80 are generally indicative of borderline intellectual functioning, while mental retardation may be generally characterized by an IQ of 70 or less. However, the IQ score is not the sole determinative factor for distinguishing between borderline intellectual functioning and mental retardation. While it is possible to diagnose mental retardation in individuals with IQs between 70 and 75, those individuals would have to demonstrate significant deficits in adaptive behavior. Conversely, mental retardation is not diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, (Text Revision 2000), *available on* Stat!Ref Library CD-ROM (Third Qtr. 2006).

any incarcerations or violence. He also reported daily headaches. Dr. Privett found the plaintiff was alert and oriented to person, place, and time and that he was easily distracted. He had some difficulty with chronologic relationships, but his memory was otherwise intact, and he had normal attention and concentration. The plaintiff also had appropriate language and an adequate fund of knowledge. Physical examination was unremarkable. Dr. Privett ordered further testing and indicated that the plaintiff needed to wean off of his "excessive ingestion" of over-the-counter medications and caffeine in order to alleviate his headaches (Tr. 184-86).

On April 22, 2003, Dr. Privett noted that an MRI of the plaintiff's brain showed findings consistent with chronic contusions and that an EEG was abnormal, but showed no epileptiform activity. He noted that since the plaintiff started using Seroquel, he had better control of his emotions. Since decreasing use of over-the-counter medications and caffeine, his headaches had "improved significantly." Dr. Privett assessed "mild" EEG abnormalities (Tr. 182).

On April 24, 2003, Dr. Robbins noted that the plaintiff's psychosis was "almost resolved" with an increased dose of Seroquel (Tr. 226).

On June 19, 2003, Dr. Robbins noted that the plaintiff had "infrequent" auditory hallucinations and that he had decreased his alcohol consumption (Tr. 225).

On August 26, 2003, the plaintiff presented to psychiatrist Dr. Ray Hodges for a consultative evaluation in connection with his application for benefits. The plaintiff reported that he drank "a couple of beers a day," to calm himself down. He said he could cook, wash clothes, clean his bathroom and mow the grass, although he did not like to do those chores. The plaintiff said that he would "sometimes . . . take the medications, sometimes not." He said that a typical day involved playing video games and visiting with friends. On examination, Dr. Hodges found the plaintiff had a full affect and was fully alert and oriented. He was generally rational in his responses and denied most psychotic

symptoms. Testing showed good immediate recall, intact long-term memory and good concentration. His thought processes were largely concrete, and judgment appeared limited. Dr. Hodges' impression was that the plaintiff had elements of an impulse disorder related to organic brain injury of the frontal lobes. He found the plaintiff's complaints of depression and anxiety were "not impressive" and that the plaintiff's mother seemed "to embellish many of his complaints." He further noted that the plaintiff "had returned to some form of productive work in the late 1990s ending reportedly when his third motor vehicle accident injured his right hand, but [he] later reported that his hand was improved[,] stating 'it is okay now.'" Dr. Hodges found it noteworthy that the plaintiff was "able to manage household chores." He stated, "[r]emarkably, [his] memory and concentration testing seem good and . . . his thought processes were concrete, yet rational. [He] did appear capable of managing his own funds . . . ." (Tr. 190-93).

On September 5, 2003, State agency psychologist Jeffrey J. Vidic, Ph.D., reviewed the plaintiff's records and completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms. Dr. Vidic found the plaintiff had an organic mental disorder (cognitive disorder NOS, mild to moderate, with current IQ in borderline intellectual functioning range), which produced "mild" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration/persistence/pace, and no episodes of decompensation. As to specific work-related activities, Dr. Vidic found that the plaintiff had some "moderate" limitations, but that he was "not significantly limited" in most areas, such as his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule; sustain an ordinary routine; and perform at a consistent pace. Dr. Vidic noted that the plaintiff could remember and follow simple instructions, attend simple tasks, make simple decisions, and adapt to minor changes in work routine. He further noted that the plaintiff could work in the presence of others and accept supervision, but that he would

not work well with the public or in close coordination with others and that he needed to avoid hazards (Tr. 194-211).

On October 6, 2003, Dr. Robbins noted that the plaintiff's psychosis continued to be controlled, although he still had intermittent auditory hallucinations. The plaintiff reported that his alcohol abuse was under control. Dr. Robbins indicated that he had "discussed referral to Voc[ational] Rehab[ilitation] to discuss employment options" but that the plaintiff had declined by stating that his mother supported him (Tr. 224).

On January 5, 2004, Dr. Robbins noted that the plaintiff's psychosis was under "good control when taking the med[ication]s." He assessed noncompliance and continuing alcohol abuse (Tr. 223).

Between April and June of 2004, Dr. Robbins noted that the plaintiff continued to have hallucinations and delusions and noted his noncompliance with medication (Tr. 219-22).

On July 12, 2004, the plaintiff told Dr. Robbins that he had been generally compliant with using Seroquel and that his auditory hallucinations had resolved. Dr. Robbins found he had a "good response to Seroquel" but had residual anger and anxiety. He increased the Seroquel dosage (Tr. 219).

On September 16, 2004, Dr. Robbins noted that the plaintiff was under stress from breaking up with his girlfriend and that this had triggered auditory hallucinations. He noted that the plaintiff's cognition was grossly intact and that his insight and judgment were good (Tr. 218).

On October 25, 2004, Dr. Robbins discussed vocational rehabilitation with the plaintiff, which he declined, stating that it was "too hard." Examination was unchanged (Tr. 217).

On November 16, 2004, Dr. Robbins completed a form indicating that the plaintiff's impairments met the requirements of Listing 12.03, with an onset date of February 27, 2003 (Tr. 215).

On November 23, 2004, Dr. Robbins noted that the plaintiff's psychosis was generally stable (Tr. 216).

Dr. Robbins reiterated on December 13, 2004, that the plaintiff's impairments met Listing 12.03 and added that his condition would "still be of [L]isting level severity if he were to cease alcohol use" (Tr. 214).

At the January 11, 2005, administrative hearing, the plaintiff testified that he could read and that he could add and subtract "a little bit" (Tr. 51). As to his activities, he said he sometimes played basketball and spent time with friends, sometimes attended church, played video games, went shopping, cut the grass, raked the yard, attended medical appointments, cooked, washed dishes, laundered clothes, ironed, swept, mopped, vacuumed, took out the trash, and cleaned the bathroom (Tr. 53-57). He testified that he had a driver's license and drove "whenever [he] could get the car" (Tr. 56).

The plaintiff's mother testified that the plaintiff was in regular school classes until his 1995 accident and that he had attended special education classes afterward (Tr. 59-60).

Vocational expert Feryal Jubran testified that the plaintiff's past work as a cleaner was unskilled work,[4] both as he performed it and as it is generally performed according to the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") (Tr. 63). The ALJ asked Ms. Jubran the following hypothetical question:

> Please assume that you're dealing with a hypothetical individual, the same age as the claimant, and the same educational background, and past work experience. Further

---

[4]Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. See 20 C.F.R. § 404.1568(a).

11

> assume this hypothetical individual has no limitations exertionally, with the following exceptions. Ropes, ladders, and scaffolds, and hazards, would be never. This individual could do simple one, two step tasks. It would require a low stressed (sic) work environment, and by that I mean a non-production work environment. Couldn't be on something where one would have to produce widgets or product, or insert a component, and a product (sic) in a high-speed manner. This person could not have a public job, and I'm talking about direct contact with the public such as a greeter at Wal-Mart, that would be never. And contact with co-workers would be occasional. And I'm not talking about dealing with the supervisors, I'm talking about close integration, where one would be sitting next to somebody, or standing next to someone, and having to coordinate with them. But contact with co-workers would be limited to occasionally. Could such an individual perform any of the claimant's past relevant work as actually performed by the claimant, or as generally performed in the national economy?

(Tr. 64-65). In response, Ms. Jubran testified that the individual could perform the past relevant job of cleaner, although the numbers of those jobs existing in the national economy would be reduced by 40% due to the restriction on ropes and ladders (Tr. 65).

## **ANALYSIS**

The ALJ found that the plaintiff retained the residual functional capacity ("RFC") for unlimited exertional work with no climbing ladders/ropes/scaffolds and the need to avoid workplace hazards, such as machinery and unprotected heights, in work involving simple 1-2 step tasks involving low stress, non-production work with no contact with the public and occasional contact with co-workers. The ALJ further found that the plaintiff could perform his past relevant work as a cleaner (Tr. 24). The plaintiff argues that the ALJ's findings are not supported by substantial evidence and that the ALJ erred by (1) finding the plaintiff's condition did not satisfy the criteria of Listing 12.05(C); and (2) failing to properly consider the opinion of his treating physician, Dr. Paul Robbins.

The plaintiff argues that the ALJ erred in failing to find that he met the Listing of Impairments under 20 C.F.R. Appendix 1, Subpart P, Listing 12.05(C). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §404.1520(d).

Listing 12.05 is the listing related to mental retardation. Mental retardation refers to "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05. Further, "[t]he required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied." *Id.* A claimant is to be found disabled under Listing 12.05(C) if he or she has the following: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.*

The ALJ found as follows with regard to Listing 12.05(C): "[B]ased on the evidence in its entirety, I find that the claimant's contention that his impairments meet or equal the requirements of Medical Listing[s] 12.03 and 12.05C is not supported by the medical evidence of record" (Tr. 23).

The evidence before the court shows that a report of neuropsychological evaluation performed by Mark T. Wagner, Ph.D., of the Medical University of South Carolina Department of Neuropsychology, reflected that the plaintiff had a full-scale IQ score of 70 (Tr. 177-80). A consultative examination of the plaintiff performed by James H. Way, Ph.D., on January 12, 1998, when the plaintiff was 17 years of age, also reflected a full-scale IQ score of 70 (Tr. 249-51). Accordingly, the plaintiff clearly meets the initial requirement of Listing 12.05(C).

13

The defendant concedes that the plaintiff "had the requisite IQ score and other severe impairments"[5] (def. brief 16-17). Specifically, in his decision, the ALJ found that the plaintiff's organic brain syndrome (mild), status post closed head injury, borderline intellectual functioning, and history of alcohol abuse were severe impairments (Tr. 24). The defendant also concedes that the ALJ "only briefly addressed Listing 12.05(C)" and "did not specifically discuss the plaintiff's IQ scores" (def. brief 14). However, the defendant argues that the ALJ's finding that the plaintiff's impairments do not meet Listing 12.05(C)'s requirements is based on substantial evidence for the following reasons: (1) the record as a whole did not show that the plaintiff met the capsule definition of mental retardation, which requires deficits in adaptive functioning; and (2) no clinical determination of mental retardation was made by the doctors who evaluated the plaintiff (def. brief 15-17). As argued by the plaintiff, the defendants have improperly added requirements to the listing analysis that do not exist in the regulations (pl. reply 1-11). Furthermore, post-hoc rationalizations are prohibited. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Because the ALJ did not state the factors and evidence upon which he relied in evaluating whether the plaintiff met Listing 12.05(C), it is impossible for this court determine whether his finding was based upon substantial evidence.

Upon remand, the ALJ is instructed to consider and evaluate the plaintiff's impairments in accordance with the foregoing to determine whether the requirements of Listing 12.05(C) are met.

Next, the plaintiff argues that the ALJ failed to properly consider the opinion of treating psychiatrist Dr. Robbins. On November 16, 2004, Dr. Robbins completed a form

---

[5]Listing 12.05(C)'s secondary requirement is a "physical or other mental impairment imposing additional and significant work-related limitation of function."

14

indicating that the plaintiff's impairments met the requirements of Listing 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders (Tr. 215). The plaintiff acknowledges in his brief that his psychosis may not meet all the criteria for Listing 12.03, but argues that Dr. Robbins' opinion was sufficient to establish that psychosis was a severe impairment (pl. brief 6; pl. reply 8).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5.

The ALJ gave Dr. Robbins' opinion "little evidentiary weight" (Tr. 22). However, as stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, *4. Dr. Robbins treated the plaintiff for psychosis from February 27, 2003, through the date of the hearing (Tr. 214-28). The reports were consistent with the report of Neuropsychological Evaluation performed by Dr. Wagner, the Division Chief of Neuropsychology at the Medical University of South Carolina, dated January 29, 2003 (Tr. 177-80). In that report, Dr. Wagner found that the plaintiff suffered from "psychotic disorder not otherwise specified" (Tr. 178). This court agrees that the evidence does not support a finding that the plaintiff met the criteria of Listing 12.03 for the reasons set forth by the ALJ in his decision (Tr. 22). However, the second prong of § 12.05(C) is met when the claimant has a physical or additional mental impairment that has a "more than slight or minimal" effect on his ability to perform work. *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986). To be significant, the functional limitation under § 12.05(C) "need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985).

Accordingly, upon remand, the ALJ is instructed to consider Dr. Robbins' opinion in accordance with the above-cited law and with regard to whether the psychosis was an impairment that imposed additional and significant work-related limitation of function.

## **CONCLUSION**

Based upon the foregoing, the Commissioner's decision is reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


                                                s/William M. Catoe
                                                United States Magistrate Judge

March 13, 2007

Greenville, South Carolina